UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNION ELECTRIC COMPANY d/b/a AMEREN UE, | ) ) | |
| Plaintiff(s), | ) ) | |
| vs. | ) ) | Case No. 4:06CV00319 ERW |
| GENERAL ELECTRIC INTERNATIONAL, INC., | ) ) ) | |
| Defendant(s). | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Plaintiff Union Electric Company ("Plaintiff" or "Ameren")'s Motion for Partial Summary Judgment [doc. #24] and Defendant General Electric International, Inc.'s ("Defendant" or "GE") Motion for Summary Judgment [doc. #26].

**I. PROCEDURAL HISTORY**

Plaintiff filed suit against Defendant seeking damages resulting from a failed rewind that was performed on a generator owned by Plaintiff. As a result of the failed rewind, the generator had to be rewound by Defendant a second time which resulted in losses to the Plaintiff. By stipulation of the parties, all discovery up to this point has been focused on contract formation; what constitutes the controlling contract for the rewind work at issue. Both parties have filed motions for Summary Judgment which the Court now considers, limited to the question of what are the terms of the controlling contract. In addition to the cross-motions for summary judgment, both parties requested oral arguments on the motions. Oral argument was held on April 11, 2002.

1

## II. BACKGROUND FACTS[1]

In February, 2002, one of Plaintiff's generators, located in their Labadie plant and sometimes referred to as the Labadie 4 generator, short circuited, or went to ground, which required the generator to be taken off-line. Ameren contracted with a company called MD&A to complete a rewind of the generator; the technical specifications of what a rewind entails are unnecessary to the pending motions. Following the rewind by MD&A, the generator was returned to the Labadie plant, however, it continued to have vibration problems. A determination was made to send the generator to GE, rather than return the unit to MD&A. Mr. Toennies, the Supervisor of engineering at the time of the incident in question, testified that Ameren was concerned about the length of time the generator would be off-line as a result of a second repair, which precipitated the decision to send the generator to GE.

On April 30, 2002, the generator was placed on a truck to be shipped to GE's Fenton, Missouri facility ("Fenton facility"), in order for Defendants to investigate the vibration problem. Unfortunately, while being transported, the generator fell off the truck into a ditch. The generator eventually arrived at the Fenton facility on May 1, 2002. During this time, negotiations were taking place between Ameren and GE regarding the scope of the work to be performed by GE. Prior to the generator falling in to the ditch, Ameren employees were hopeful that the vibration problem could be easily fixed. However, after that incident, it was believed that the generator would have to be rewound a second time ("the second rewind"). A determination was made that the rewind work was to be done in Defendant's Chicago, Illinois facility ("the Chicago facility").

---

[1]These facts are taken from the parties' statements of uncontroverted facts, their responses to the opposing parties' statement of uncontroverted facts, as well as this Court's review of the evidence submitted in support of the pending motion. The Court will note where the parties disagree over the facts.

On May 9, 2002 the generator was shipped to the Chicago facility, and work began immediately upon arrival, on May 11, 2002. None of the above facts are disputed by the parties.

It is further undisputed that a proposal was created by Jerry Hyde, an employee of GE, regarding the Labadie 4 generator work. A letter proposal was sent to, and received by Mr. Toennies, on May 7, 2002 ("the May 7 proposal"). The May 7 proposal contained no terms and conditions, nor did it contain a quotation for shipping costs. It is also undisputed that a May 8, 2002 revised proposal ("the May 8 proposal") was created, and was attached to an e-mail which was sent to an Ameren engineer, Ron Boelloeni. The May 8 proposal contained additional pricing for shipping, and also contained GE's terms and conditions. There is no evidence presented that Mr. Boelloeni forwarded the May 8 proposal to any Ameren employee in purchasing, nor is there any evidence that GE sent the May 8 proposal to any Ameren employee other than Mr. Boelloeni.

At some point, between May 7, 2002 and when work began on May 11, 2002, a verbal Purchase Order Number was provided to Mr. Hyde, the GE employee supervising the work order negotiations, which allowed work to begin on the generator. It is also undisputed that on May 15, 2002, two written Purchase Orders,[2] were faxed to GE, to the attention of Mr. Hyde; the Purchase Orders were also sent on that same day to GE. The faxed copies of the Purchase Orders did not contain the reverse side which contained Ameren's terms and conditions, but did include a sentence on the bottom which states "your acceptance of this order is subject to the conditions

---

[2]The reason for two different purchase order numbers is not entirely clear. According to testimony by Mr. Davis, who was an Ameren employee in the purchasing department, the reason for two purchase orders was most likely due to internal procedure which required different portions of the repairs to be billed to different cost centers within the company. For purposes of this opinion the Court will refer to the written purchase orders to encompass both purchase orders. They both contained the same terms and conditions, and acknowledgment page.

3

specified on the reverse side." *Def. Mot. for Sum. Judg.*, ex. 8. The mailed copies did include the terms and conditions. Furthermore, Mr. Hyde testified that he was aware of Ameren's usual policy of following up a verbal purchase order number with a written purchase order which would contain Ameren's terms and conditions. Both the faxed and mailed purchase orders contained a reference to the May 7 proposal, specifically, "Pricing per GE proposal letter from Jerry Hyde-GE, dated May 7, 2002." *Def. Mot. for Sum. Judg.*, ex. 8. There was no reference made in any Ameren document to the May 8, 2002 proposal. On June 12, 2002, Defendant sent an "Acknowledgement [sic] of Order for Services," which responded to the work performed on the Labadie 4 generator, and which again referenced GE's terms and conditions.

The generator was returned to the Labadie plant in early to mid June, at which time a high potential test ("Hipot test") was performed. During the Hipot test the generator shorted out. Consequently the generator had to be returned to Defendant's Chicago facility to be rewound a third time ("the third rewind"). The third rewind was done at Defendant's expense. The generator was returned in July, 2002 to the Labadie plant, at which time it was operational.

The above facts are largely undisputed. However, there are a number of facts which are disputed, which this Court finds are material and therefore prevent a summary judgment ruling. There is a dispute over when Mr. Hyde received the verbal purchase order number from the Plaintiff. Whether this occurred before or after Mr. Boelloeni received the e-mail from Mr. Hyde containing the May 8 proposal with GE's terms and conditions. There is also disputed testimony regarding whether Mr. Boelloeni was a sufficient recipient of the May 8 proposal. There is testimony from multiple Ameren employees that Mr. Boelloeni was the technical contact for the project, and that Mr. Davis was the commercial contact. However, there is also an e-mail instructing Mr. Hyde to contact Mr. Boelloeni with any questions. There is further testimony that

4

Mr. Hyde had worked with Ameren on numerous projects, and was aware of Ameren's procedures regarding purchase orders, and regarding the use of terms and conditions. The above facts clearly evidence an intent for GE to perform repair work on the Labadie 4 generator, and furthermore the price for that work was agreed upon. However, the question remains which of the numerous documents that were sent back and forth between the parties, contain the controlling terms.

**III. LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment only if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The United States Supreme Court has noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327 (quoting Fed. R. Civ. P. 1). "By its terms, [Rule 56(c)(1)] provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Id*. Further, if the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a

complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The initial burden of proof in a motion for summary judgment is placed on the moving party to establish the non-existence of any genuine issue of fact that is material to a judgment in its favor. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). Once this burden is discharged, if the record does, in fact, bear out that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing there is a genuine dispute on that issue. *Anderson*, 477 U.S. at 249. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). To meet its burden, the non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the non-moving party must show there is sufficient evidence favoring the non-moving party which would enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249; *Celotex*, 477 U.S. at 324. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

## IV. DISCUSSION

Plaintiff and Defendant propose two different series of events that led to the formation of a contract. Plaintiff appears to alternately present two arguments. First, Plaintiff asserts that the oral Purchase Order Number was given to Mr. Hyde prior to the receipt of the May 8, 2002 proposal, and therefore the verbal Purchase Order Number served as an acceptance of the May 7,

6

2002 proposal, and the follow up written purchase order contains the controlling terms of the contract. Alternately, Plaintiff argues that the May 8, 2002 proposal was an offer by Defendants, and that the May 15, 2002 written purchase order was a counter-offer, which was accepted by Defendant's failure to object and continued performance of the repair work. Defendant argues that neither of these alternatives is correct, but rather, the May 7 proposal was on offer which was never accepted, and was superceded by the May 8 proposal which withdrew the May 7 offer. The acceptance of the May 8 proposal was in the form of permission to commence work on the generator. Defendants argue that the written Purchase Orders were an offer to modify the contract that was already formed and thus have no legal effect.

The applicable Missouri contract law is easy to quote, but difficult to apply; there are a number of rules to which both parties cite. In order to have a contract both offer and acceptance are required. *Crestwood Shops, L.L.C. v. Hilkene*, 197 S.W.3d 641, 649 (Mo.Ct.App. 2006). "Acceptance must be unequivocal and a 'mirror-image' of the offer." *Id.* If an acceptance includes different or variant terms, then it is not an acceptance, but rather a rejection of the initial offer and a counter-offer. *Id.* "A determination of whether an offer has been accepted depends upon what is actually said and done; it does not depend on the understanding or supposition of one of the parties." *Id.* Furthermore, there are certain circumstances where an offer may be accepted by conduct or the failure to act. "Acceptance of an offer need not be made by spoken or written word. . .. This is especially true where services are rendered under circumstances such that the party benefitted thereby knows the terms on which they are being offered. If the party receives the benefit of services in silence, when there was a reasonable opportunity to reject them, this party is manifesting assent to the terms proposed and thus accepts the offer." *Citibank (South*

*Dakota), N.A. v. Wilson*, 160 S.W.3d 810, 813 (Mo.Ct.App. 2005); *see also Carter v. Firestone*, 2006 WL 1153808, *3 (E.D.Mo. April 28, 2006).

There are a number of different conclusions that can be reached based on the facts which are undisputed and Missouri contract law cited above. There are two main areas of dispute among the parties as to the facts which result in a denial of both parties' motions for summary judgment. If, as Defendant asserts, there was no phone call prior to the May 8 letter proposal, then under Missouri law it is possible for Mr. Boelloeni's actions in supervising the performance of work by GE to constitute acceptance of that May 8, 2002 proposal, and therefore those terms would apply. Mr. Hyde testified that he does not recall receiving a phone call from either Mr. Davis, or Mr. Krygiel in purchasing regarding a verbal purchase order number on the morning of May 8, 2002. However, Mr. Davis testified to making such a telephone call, and although he did not remember the exact time that the phone call was made he pointed to a notation on an internal document which indicated it took place on the morning of May 8, 2002. However, as this provides conflicting testimony, an order of summary judgment in favor of Defendant would be inappropriate on this issue.

In further support of this conclusion, there is a material question of fact whether Mr. Boelloeni, who received the May 8 proposal, was in a position to authorize that proposal, and whether Mr. Hyde was correct in relying on his acceptance of those terms if in fact his silence constitutes acceptance of that agreement. According to protocol, the purchasing department is to make decisions regarding terms, in conjunction with the legal department; this was not within the scope of Mr. Boelloeni's job description. There is further evidence that Mr. Hyde had worked with Ameren on a number of jobs and therefore was aware of Ameren's procedure. Neither party has provided sufficient evidence of what the course of events was between the original GE offer

on May 7, 2002, and the commencement of work on May 11, 2002, and therefore summary judgment is inappropriate.

## V. CONCLUSION

The key disputed fact in this case is whether Ameren made a phone call to Mr. Hyde of GE on the morning of May 8, 2002. Although both parties argue that this is immaterial, the Court does not agree. An offer can be accepted until that point in time when it is withdrawn; GE's May 8, 2002 proposal would have revoked the May 7, 2002 proposal. However, if Ameren had already accepted the initial proposal, then the May 8 proposal would have no effect. At which point it would be necessary to determine whether Mr. Hyde had sufficient knowledge of Ameren's procedure of providing a written purchase order with terms and conditions, for those terms and conditions to be binding; this presents a second question of fact for a jury. Therefore, both Plaintiff's Motion for Partial Summary Judgment, and Defendant's Motion for Summary Judgment are denied.
Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment [doc. #24] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [doc. #26] is **DENIED.**

Dated this 16th Day of April, 2007.

```
                                        E. RICHARD WEBBER
                                        UNITED STATES DISTRICT JUDGE
```